WILLIAM H. HARKER, HOWARD G. WINTLING AND HARRY J. DUNN, IN THEIR OWN RIGHT AND FOR AND ON BEHALF OF ALL OTHER MEMBERS OF INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, LOCAL NO. 1, AND INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, LOCAL NO. 1, AN UNINCORPORATED ASSOCIATION, PLAINTIFFS-APPELLANTS. v. JAMES C. McKISSOCK, ROBERT RULON, HERMAN SCHOMBER, ADOLPH F. PRYZWARA, THOMAS W. SAUL, JOHN J. KNOWLES, ROBERT E. KAVANAGH, WILLIAM R. ANDERTON, LESTER INVESTMENT COMPANY, A BODY CORPORATE, AND SHIPBUILDERS EDUCATIONAL SOCIETY, A CORPORATION NOT FOR PROFIT, DEFENDANTS-RESPONDENTS, AND NEW YORK SHIPBUILDING CORPORATION, FIRST CAMDEN NATIONAL BANK AND TRUST COMPANY, I.U.M.S.W.A. FEDERAL CREDIT UNION, A BODY CORPORATE, HADDONFIELD NATIONAL BANK, FIRST NATIONAL BANK OF MARLTON, AND UNION FEDERAL SAVINGS AND LOAN ASSOCIATION, A BODY CORPORATE, DEFENDANTS, AND INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, AN UNINCORPORATED ASSOCIATION, DEFENDANT-APPELLANT.

Argued April 16, 1951—Decided June 18, 1951.

*Mr. M. H. Goldstein,* of the Philadelphia Bar, argued the cause for the plaintiff-appellants, *pro hac vice* with the permission of the court (*Mr. Barney B. Brown,* attorney).

*Mr. Albert B. Melnik* argued the cause for the defendant-appellant.

*Mr. F. Morse Archer, Jr.,* argued the cause for the defendant-respondents (*Messrs. Boyle, Archer & Greiner,* attorneys).

The opinion of the court was delivered by

HEHER, J The questions posed here are (1) whether there was a valid secession of the plaintiff Local Union No. 1 from the defendant Industrial Union of Marine and Shipbuilding Workers of America, and (2) whether a self-executing provision of the national union's constitution for the transfer, upon disaffiliation, of the local affiliate's property to the national union is valid and enforceable.

The Appellate Division of the Superior Court unanimously resolved the first issue in the affirmative, and the second in the negative, with Judge Bigelow dissenting. The case is here under Article VI, section V, paragraph 1(b) of the Constitution of 1947 and *Rule* 1:2–1(*b*) of this court.

The national union comprises Local No. 1, composed of employees of the New York Shipbuilding Corporation at its shipyard in Camden, New Jersey, Local No. 2, consisting of employees of the Sun Shipbuilding and Dry Dock Company at its shipyard in Chester, Pennsylvania, and Local No. 3, made up of employees of the Pusey and Jones Corporation at its plant in Wilmington, Delaware, devoted to shipbuilding and the manufacture of paper-making machines. The national and local units are all unincorporated associations. The contention is that National was organized to secure united action by all the employees of a given industry irrespective of trade or craft, industrial unionism as distinguished from draft unionism, "One Industry—One Union," and thus the better to serve the interests of all workmen in

the industry; and that to this end the national and local unions came into being as an integrated whole by the common effort of all. It is said that "membership from the very outset was in the national organization," and that the central council of that body "initially set up a constitution under which all three locals could and did govern themselves," and "the local union had no existence apart from and before the formation of the national union." In a word, the insistence is that the local unions derive their being from the national union's constitution, whence comes also the essential rights of membership, and they are in substance and effect but subordinate units for local administration. The Local is deemed "a mere constituent part" of "a single integrated national structure."

But this is not a realistic conception of the relations between the local affiliates and their members and the central body. The locals are separate and distinct units primarily designed to secure and maintain an equality of bargaining power between the employer and their employee-members in the economic struggle for the fruits of the joint productive effort of labor and capital; and the association of the locals into the national union was in furtherance of the same end. These associations are consensual entities capable of entering into such legal relations with their members. The essential purpose was the affiliation of the local unions into a common enterprise to increase by collective action the common bargaining power in respect of the terms and conditions of labor. Yet the locals remained the basic units of the association, free to serve their own and the common interest of all subject to the restraints imposed by the constitution and laws of the association, and free also to renounce the affiliation for mutual welfare upon the terms laid down in the agreement which brought it into existence.

The right of disaffiliation was inherent in the compact. The association is essentially conventional in character. It derives from the common consent of the parties, and is limited accordingly. The inquiry concerns the nature and

scope of the common undertaking; and, in the quest for the common intention, the situation of the parties and the accompanying circumstances are to be considered. Regard must be had to the relation of the parties and the surroundings when the agreement was made and the objects which they were striving to attain. Like other contractual relationships, trade union membership is purely voluntary; and the parties are bound only to the extent set by the agreement. The rights and liabilities of the parties are measured by the contract; and it is the judicial function to enforce the contract in all its terms, save as it may transcend public policy or the law of the land. *Cameron v. International Alliance of Theatrical Stage Employees and Moving Picture Operators*, 118 *N. J. Eq.* 11 (*E. & A.* 1935); *Ibid.* 119 *N. J. Eq.* 577 (*E. & A.* 1936).

■ Judicial intervention in the internal affairs of trade unions is generally exerted for the protection of a "property right" or for the enforcement of what is deemed a contract expressed in the union's constitution and laws. *Fleming v. Moving Picture Machine Operators*, 124 *N. J. Eq.* 269 (*E. & A.* 1938); *Otto v. Journeymen Tailors' Protective & Benevolent Union*, 75 *Cal.* 308, 17 *Pac.* 217 (1888); *Spayd v. Ringing Rock Lodge*, 270 *Pa.* 67, 113 *A.* 70 (1921); *Snay v. Lovely*, 276 *Mass.* 159, 176 *N. E.* 791 (1931); *Polin v. Kaplan*, 257 *N. Y.* 277, 177 *N. E.* 833 (1931); *Alexion v. Hollingsworth*, 289 *N. Y.* 91, 43 *N. E.* (*2d*) 825 (1942). The property and contract theories have been criticized as pure legal fictions. One writer suggests as a rational alternative concept the recognition of the union member as "essentially a citizen within an industrial government," and the function of the courts as the prescription of "the minimum standards for the protection of individuals within that government." 64 *Harvard Law Review* 1048, 1100. See, also, 43 *Harvard Law Review* 993; 87 *University of Pennsylvania Law Review* 985. But even though the relationship be deemed *sui generis*, not altogether governed by the principles of the law of contracts, it is yet an association derived

from and dependent upon the common consent of the parties, expressed in the constitution and laws of the association, and the legal consequences of the compact are measured accordingly. There is a consensual relation giving rise to interests of substance which the law will protect. And the contract rationalization is generally considered sound and adequate. A voluntary association of this class is in its very nature a creature of contract by its members, though it is not necessarily a legal entity for all purposes distinct from its component members.

The articles of agreement are embodied in the constitution and laws of the association; and it is fundamental in the law of contracts that the legal rights and duties thereby arising shall be enforced as written unless condemned by the law. The conventional combination derives its force from and subsists by the will of the parties, and its dissolution entails such consequences as the parties have stipulated, consistent with law and established public policy. The contract establishes the rights of the association and the component unions and the individual members, in relation to one another.

We have considered the provisions of National's constitution and Local's laws cited in support of the thesis that affiliation "is not a mere voluntary relation of completely autonomous associations, to be severed at will, but that each local union is a dependent member of the national union, irrevocably tied thereto." They are not in their nature and sweep definitive of this basic design. They are not, either singly or in the aggregate, indicative of a purpose to fuse once and for all the local unit into the national union and thereby preclude the local autonomy and separate existence characteristic of a voluntary affiliation dependent for its continuance upon the will of the parties. In the main these provisions delineate the jurisdiction of the confederation and the affiliated units with reference to collective bargaining, membership and discipline, assessments for the common cause, participation of the local units in the affairs of the

association, and the regulation of the locals in the common interest through the instrumentality of the association. For instance, by article I, section 6 of National's constitution, that body and the local affiliate "of which he is a member, and each of them, shall be the exclusive representative of each member of this Union" for the purpose of collective bargaining as to terms and conditions of work, and in relation to all claims, grievances and controversies arising out of the employer-employee relationship or affecting his status as an employee or as a member of the national or local unions. These provisions lay restraints upon the activities of the local union, but they do not deny its separate existence and make of it a mere "administrative arm" of National. Were there doubt as to this, it would be resolved by article IV, section 22 of the National's constitution, providing thus: ".Upon the dissolution, suspension, expulsion, or termination of affiliation of any Local or Division from this Union, the Charter, Seal, and all monies, books, and properties of that Local or Division shall automatically become the property of the G. E. B., and the Officers of that Local or Division shall be responsible for their immediate transmission to the G. E. B." The abbreviation has reference to the General Executive Board of National, composed of National's officers and "twelve other members," which is vested by the constitution with the Association's "executive and judicial powers, when the convention is not in session," more specifically enumerated in the constitution. The property thus transferred to the General Executive Board is held in trust for National.

There is no reason of policy or consideration of natural justice forbidding the enforcement of the provision of National's constitution for the forfeiture of Local's property in the event of disaffiliation. The separation was the voluntary act of Local; and, while the right of disaffiliation was reserved, by common consent its exercise worked an automatic transfer of its property to National. This was a basic term in the agreement that brought about the con-

federation, and there is no rational ground for refusing performance of the stipulation. The ruling principle was applied by the Court of Errors and Appeals in *Fidelity and Deposit Co. of Maryland v. Brotherhood of Painters, Decorators and Paperhangers of America,* 120 *N. J. Eq.* 346 (*E. & A.* 1936). There, the local was for good cause expelled from the national union. For the purpose of avoiding individual liability, the local was, some 11 years after its organization, incorporated under the statute of New Jersey authorizing the incorporation of associations not for pecuniary profit; and the point was made that the local was no longer a voluntary association subject to a charter provision for the transfer of the local's property to the national body in the event of dissolution, revocation of its charter, or withdrawal from the parent association. The holding was that the local was charged with the reciprocal burdens of membership in the national union, and its incorporation did not serve to discharge the voluntarily assumed obligations arising out of the severance of its relation to the parent body. Mr. Justice Parker said: "On the most elementary principles of equity it would seem that a subordinate organization which for so many years has reaped the benefits of its membership should be similarly charged with the corresponding burdens, and that when in addition to its membership it elected to take out a state incorporation for the purpose, and so far as the testimony indicates for the sole purpose of protecting its individual members from liability for damages, such ancillary incorporation should not be allowed to operate as an obstruction or hindrance of its obligation under the by-laws which it has never repudiated in any way, and the decree of General thereunder should stand at present unchallenged." See, also, *United Public Workers v. Fennimore,* 6 *N. J. Super.* 589 (*Ch. Div.* 1950).

Here, the contract of association into a national union was made in September, 1934; and the affiliation continued for more than 14 years. It is fundamental that the local unit cannot accept the benefits of the enterprise and

reject its burdens. The enforcement of the particular provision will not constitute a forfeiture in the odious legal sense. The law cannot create contractual obligations which are not based on the expressed intention of the parties; but the performance of promises or conditions agreed upon by the parties may be excused for reasons which the law deems just. The mere fact that a promise or condition is "somewhat harsh or unfair in its operation" does not excuse performance; the fundamental idea of a nonenforceable forfeiture is that the person against whom it is directed "thereby loses property which belonged to him, without adequate return and without any breach of duty on his part commensurate in value with the property lost." *Williston on Contracts (Rev. ed.), sections* 769, 780. The jurisdiction of equity to relieve against forfeitures and penalties was early the subject of controversy. It was generally considered as a branch of equity jurisdiction to relieve against accidents, but relief from the consequences of mere default was also afforded. Lord Eldon condemned the jurisdiction as founded on "a principle long acknowledged in this court but utterly without foundation." *Hill v. Barclay,* 18 *Ves.* 56 (1811). But the doctrine came to have general acceptance. Jurisdiction to grant relief against mistake was broadened to include the consequences of inadvertence which would offend against the principles of natural justice or conscience. *Spence's Equitable Jurisdiction* 628, *et seq.* Mr. Justice Story stated it thus: "There is no more intrinsic sanctity in stipulations by contract than in other solemn acts of the parties which are constantly interfered with by courts of equity upon the broad grounds of public policy or the pure principles of natural justice." *Story's Equity Jurisprudence* (13th ed.), *section* 1316. Thus conditioned, the intention of the parties is the law of contracts. As the contract may prescribe the precise terms upon which membership in a trade union may be gained, "so may it conclusively define the conditions which will entail its loss." *Polin v. Kaplan, supra.* Here, Local chose to become a constituent of National under "a

contract which determined the rights and duties of the constituent society and its members," enforceable in all its terms unless violative of an overriding public policy; and the subordinate unit cannot now invoke its reserved right of disaffiliation without submission to the contractual consequences of that course which are not obnoxious to the law. *Alexion v. Hollingsworth, supra.* There is no consideration of law or equity for refusing performance of the bargain according to its terms. The particular provision does not work a forfeiture as in the case of the enforcement of a mortgage in keeping with the strict letter of the contract, entailing a loss to the mortgagor and a gain to the mortgagee out of all proportion to the importance of the mortgagor's breach of contract. *Spence's Equitable Jurisdiction* 629, *et seq.* Disaffiliation was deliberately conditioned on the loss of Local's property; and the enforcement of the will of the parties will not give National an unconscientious advantage. The concession was based upon the benefits to be had from the association for mutual welfare of the component units and their members. It expresses the real intention of the parties. Equitable interposition with the freedom of contract is not justifiable on this ground unless the agreement works an unconscionable hardship or contravenes natural justice.

The cases of *State Council of the Junior Order of United American Mechanics v. Enterprise Council, No. 6, 75 N. J. Eq.* 245 (*E. & A.* 1909) and *Grand Court of Foresters of America v. Court Cavour,* 133, *82 N. J. Eq.* 89 (*Ch.* 1913), affirmed *83 N. J. Eq.* 343 (*E. & A.* 1914), are not in point. Apart from structural and other differences of substance, these cases involved funds held by fraternal and beneficial societies under benefit payment plans, segregated and administered by the local unit to that end, and deemed to constitute a true trust for the benefit of the individual members rather than for the benefit of the society. *Knights of Pythias v. Germania Lodge No. 50, 56 N. J. Eq.* 63 (*Ch.* 1897). *Vide Scott v. Donahue,* 93 *Cal. App.* 126, 209 *Pac.* 455 (1928); *State Council v. Emery,* 219 *Pa.* 461 (1936). There are

other considerations which in equity militate against the operation of a forfeiture clause, but they are not pertinent here. We are not persuaded that the enforcement of this provision will interfere with collective bargaining or the "free choice of representatives" as guaranteed by federal law and Article I, paragraph 19 of the State Constitution of 1947, or that property of Local representing dues and initiation fees paid by its members constitutes a "trust fund" for collective bargaining purposes which is for that reason beyond the operation of the provision in question. These are not sufficient grounds for Local's disavowal of the contract upon its voluntary secession from National. Neither the right of collective bargaining nor freedom in the choice of representatives was in anywise impaired. Indeed, the act of disaffiliation was to serve those principles.

We concur in the conclusion of the Appellate Division that there was a valid and effective act of disaffiliation by Local's membership. Unanimous action was not requisite for the dissolution of this voluntary relation. And, if the original action was abortive for want of adequate notice, it was subsequently ratified. We find no violation by National of "an implied condition of affiliation," in relation to what is termed the "basic precept" of "One Industry—One Union" which precludes enforcement of the provision under review. And there is no showing of laches or circumstances calling for the application of the "unclean hands" doctrine.

The judgment is accordingly modified and, as so modified, affirmed.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD and ACKERSON—4.

*For affirmance*—Justices CASE, OLIPHANT and BURLING —3.